# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Jessica T. Devin,

                              Plaintiff,

                                        Civ. No. 04-4555 (RHK/AJB)
                                        **MEMORANDUM OPINION**
                                        **AND ORDER**

v.

Schwan's Home Service, Inc.,

                              Defendant.

Jessica J. Clay and James H. Kaster, Nichols Kaster & Anderson, PLLP, Minneapolis, Minnesota, for Plaintiff.

Kurt J. Erickson, McCollum, Crowley, Moschet & Miller, Ltd., Minneapolis, Minnesota, for Defendant.

## Introduction

        In this gender discrimination case, Plaintiff Jessica T. Devin claims that she was

discriminated against, retaliated against, and denied equal pay by her former employer,

Defendant Schwan's Home Service, Inc. ("Schwan's").  She brings her claims under federal

and state law.  Schwan's has moved for summary judgment arguing, inter alia, that Devin did

not suffer an adverse employment action during her employment with Schwan's, that she

terminated her employment with Schwan's voluntarily, and that she received equal pay.  For

the reasons set forth below, the Court will grant the Motion.

**Background**

Schwan's sells frozen food directly to customers in their homes through a system of

depots and Route Managers (RMs), who deliver products, collect payment, and solicit

further orders.  From January 2003 to January 2004, Devin was employed as an RM at

Schwan's depot in Savage, Minnesota.  (Devin Dep. Tr. at 60; Clay Aff. Ex. 1.)  Soon after

Devin was hired, Joey Gilb became the manager and supervisor of the Savage Depot.

(Devin Dep. Tr. at 86.)  Devin was the only female RM working out of the Savage Depot for

much of her time there, and was only the second female RM to hold the position during the

2000-2006 time frame.  (Devin Dep. Tr. at 135, 142, 263.)

**A.      Devin's Compensation**

RMs are compensated in two ways: guaranteed daily pay and commissions from

their sales.  The guaranteed pay is implemented in the form of "step-down guarantees."

(Gilb Dep. Tr. at 28-29, 70-71.)  RMs are guaranteed a certain amount of daily pay for the

first couple of months on the job—the training period.  (Id.)  After the training period, and

once the RM is assigned a route, that guaranteed rate of pay declines every month until the

RM is not receiving any guaranteed pay.  Presumably the decline in guaranteed pay will be

made up by the RM's commissions.  (Id.)  This system of payment is designed to provide

the RMs with steady income while they are training and getting started on their routes, and

then shifting them over to a purely commission-based paycheck.

On January 6, 2003, Devin began her training at Schwan's and was given a guarantee

of $700 per week.  (Clay Aff. Ex. 2.)  The written agreement regarding her initial guarantee

stated that she would receive the $700 per week guarantee for eight weeks while she was in training, after which the guarantee would begin to incrementally decline, becoming a step-down or declining guarantee.[1]  (Id.)  She was also verbally assured by her initial supervisor and by Gilb that they would "never let [their] good sales managers fall below $700 per week."  (Devin Dep. Tr. at 68, 69.)  Devin's understanding was that "if you fell short of goal, that your pay would be supplemented."  (Id. at 69.)  Devin worked weeks in September, October, and November, in which her commissions did not meet the $700 mark and Gilb supplemented her pay.  (Clay Aff. Ex. 4 (Devin's notes stating her pay stubs "indicate 10/9 and 11/6 as two times a supplement was given—I believe there was also a time in September").)

On three other occasions, however, Devin's pay fell below $700 per week and she did not receive any supplemental pay to make up for the difference—those paychecks were dated October 16, 2003 (for the period ending October 11, 2003), December 4, 2003 (for the period ending November 29, 2003), and December 11, 2003 (for the period ending December 6, 2003).  (Clay Aff. Ex. 41.)

Devin approached Gilb about her pay in late November, when she knew that her December 4, 2003 paycheck would be below $700.  (Clay Aff. Ex. 4.)  She alerted Gilb to the fact that she had "a bad sales week" and so her pay would need to be supplemented.

---

[1]Devin's step-down guarantee agreement consists of a hand-written note signed by Pat Dero, Devin's supervisor for the short period of time prior to Gilb's start at the Savage Depot.  (Clay Aff. Ex. 2; Devin Dep. Tr. at 77-78.)

(Devin Dep. Tr. at 190-91.)  According to Devin, Gilb responded that he was not going to supplement her pay because he didn't "believe [she] deserve[d] it."  (Id. at 191.)  Gilb told her that he did not "feel [she] was working hard enough" because her "overall sales were lower, and he did not feel that [she] was making as many new customers per day as [she] could."  (Id.)

The record also indicates that Gilb eventually responded to Devin's concerns by supplementing her pay the week following her December 11, 2003 paycheck, bringing her December 18, 2003 paycheck up from $695 to $874.  (Gilb Dep. Ex. 8.)  He also agreed to extend a $700 per week guarantee to Devin provided that she met certain performance criteria.  (Clay Aff. Ex. 5.)  On December 15, 2003, Gilb wrote Devin a letter, stating that:

> [b]ecause this is a commission position, we do not give out 'safety nets' as a part of the pay package.  At the same time I do not want to lose a valuable Route Manager because of a couple 'off' weeks.  With that [in] mind I can guarantee $700.00 per week if you have 12 hours or more of sell time on each of the 4 days, and obtain 6 or more 'contacts' per day during the week in question.
>
> I am extending this guarantee with a high level of comfort, because it has been my experience that a Route Manager that does these things will not need help to reach $700.00 in commissions each week.

(Clay Aff. Ex. 5.)  Devin was "shocked" by the conditions Gilb placed on her ability to receive the guarantee.  (Devin Dep. Tr. at 198-200.)  She did not know of any other RMs who were required to meet the conditions set out in Gilb's letter, and she "felt the conditions were unfair and that they broke DOT regulations."  (Id. at 201.)

Devin points to four male RMs working out of the Savage Depot who she alleges

were given a $700 per week guarantee: Bradley Wolbersen, David Christenson, Thomas

Renaud, and Kenneth Fistrovich.  (Mem. in Opp'n at 4-5, 8; Clay Aff. Exs. 28, 30, 33;

Fistrovich Dep. Ex. 81.)   She alleges that all four of these RMs received step-down

guarantees outside of their training periods.  (Id.)  Devin's step-down guarantee was in

effect until she ended her employment at Schwan's.  (Gilb Dep. Exs. 5, 8.)  She was

receiving a $35 per day guarantee in November and early December 2003, which then

decreased to $30 per day in the second week of December 2003.  (Id.)

## B.    Assignment of a Route Builder

In April 2003, Gilb hired "route builders" to work out of the Savage Depot, in order

to obtain new Schwan's customers.  Route builders are Schwan's employees who are not

assigned to a permanent route; rather they solicit homes of non-Schwan's customers,

providing them with information about Schwan's products, in an effort to build the

customer base for RMs.  Gilb testified that there were two main functions that a route

builder served.  (Gilb Dep. Tr. at 94.)  First, a route builder could be used to attempt to add

new "route days" to an existing route, which would include "taking regular routes and . . .

making them into split route systems that actually supported two people instead of one."

(Id. at 48.)  This is how route builders are "generally used," and is the "first priority" for

their use.  (Id. at 94.)  Second, a route builder could be used to add customers to existing

"route days," that is, to "add additional stops to existing route days."  (Id.)

Devin was not initially assigned a route builder.  She complained to Gilb regarding

the fact that she had not been provided a route builder, and that she perceived this to be

unfair.  (Gilb Dep. Tr. at 49-50, 91-96.)  According to Devin, when she asked Gilb why she was not assigned a route builder, he initially told her that her "route was not a priority," and that other routes needed it more.  (Devin Dep. Tr. at 100-101.)  Devin believed Gilb was lying when he told her that.  (Id.)  She claims that when she brought the route builder issue up again in June or October 2003, asking Gilb specifically why Fistrovich was assigned a route builder instead of her, Gilb said "it was because Mr. Fistrovich had a family to support and bills to pay."  (Id. at 102; Clay Aff. Ex. 4.)  Devin believed this was a "purely sexist comment" and reported it to Schwan's Human Resources Director, La Verna Hovance.  (Devin Dep. Tr. at 125.)

On December 10, 2003, Gilb assigned Devin a route builder.  (Gilb Dep. Tr. at 94; see Compl. ¶ 22.)  Gilb assigned Devin a route builder "[a]s soon as [he] had somebody available to top off routes."  (Gilb Dep. Tr. at 95.)  "Because she had asked on several occasions" to have a route builder assigned to her route, Devin "was first priority."  (Id.)  Gilb had also assigned Devin a route builder for one or two days prior to August 2003.  (Clay Aff. Ex. 9.)

Certain male RMs were assigned route builders prior to December 10, 2003.  Devin claims that RMs Wolbersen and Dudley Thomas were assigned route builders despite the fact that their routes had more customers than her's.  (Devin Dep. Tr. at 99.)  Gilb claims that those and other RMs who were assigned route builders were working routes that were going "from regular routes to split routes, and [Schwan's] had to finish building the route dates . . . . [T]he intent was not to have them to increase their route-per-day volume.  They

6

were actually creating new route days." (Gilb Dep. Tr. at 93.) In fact, the evidence indicates that Wolbersen was transferring to a split route during the time period that route builders were being utilized (see Clay Aff. Ex. 28), and there is no evidence in the record to indicate otherwise with respect to Thomas.

## C.    Other Related Facts

Devin describes other incidents at Schwan's that she believes were motivated by her gender. Devin alleges that when she first met Gilb, in February 2003, he told her that he "belie[ved] that [she] would not make a very good route manager and [she] should consider hostessing sampling parties[2]." (Devin Dep. Tr. at 87 (footnote added).) Around the same time, when Devin was still in training, Gilb told Devin that she was "tougher than [he] thought [she] would be," after he rode with her on a route. (Id. at 125.) Devin took this comment as a complement. (Id. at 126-27.)

On June 26, 2003, when Devin was late for a morning sales meeting, Gilb got upset and told her to "choose [her] last day at Schwan's" and that she "was not route manager material." (Devin Dep. Tr. at 118-19.) Devin brought this incident to Hovance's attention. (See Clay Aff. Ex. 9.) Devin then had a meeting with Gilb, during which Gilb "withdr[ew] his request and assured [Devin] that [she] would not be 'singled out' in the future." (Id.)

---

[2]Gilb denies saying this to Devin. (Gilb Dep. Tr. at 17-18.) According to Gilb, sampling parties are events that Schwan's puts on in multi-unit housing apartments, at which Schwan's provides samples of their products—"normally, it is pizzas, ice cream, and juice." (Id. at 18.) Sampling parties were occasionally hosted by RMs or route builders, and Schwan's did not have a position that was solely dedicated to throwing sampling parties at the time Gilb allegedly suggested the idea to Devin. (Devin Dep. Tr. at 87.)

Devin and Gilb "seemed to agree that it would be in everyone's best interests if [they] set aside past issues and worked on cultivating a better working relationship."  (Id.)

On July 2, 2003, Devin received a written Performance Notice from Gilb regarding her failure to meet a "new contacts" requirement[3] on July 1, 2003.  (Clay Aff. Ex. 7.)  Two other male RMs—Wolbersen and Christenson—were not given written or verbal warnings when they failed to meet their "new contacts" requirements.  (See Wolbersen Dep. Tr. at 22-24; Christenson Dep. Tr. at 32-33.)  On July 4, 2003, Devin wrote to Hovance to complain about Gilb's "disparate treatment of [her] and his negative attitude toward [her]." (Clay Aff. Ex. 9.)

Devin also claims that she was treated less favorably than male RMs because she was not allowed to expense her phone calls to customers, she was not given "freezer drop sales"—large sales where an apartment building is offered discounted ice cream or treats—she was criticized regarding her truck inventory, and she was told that she had an aggressive attitude toward the warehouse staff.  (Devin Dep. Tr. at 116; Clay Aff. Ex. 4.)

**D.    Devin's November and December Complaints to Human Resources and Her Decision to Leave Schwan's**

In late November, Devin complained to Hovance about the fact that her pay had not been supplemented despite the fact that it was under $700 (see supra pp.3-4), and that she had received a write-up from Gilb regarding a customer complaint.  (Clay Aff. Ex. 4.)  In

---

[3]RMs were required to "introduce themselves and Schwans to six new people every day."  (Clay Aff. Ex. 7.)  These new contacts were recorded by the RMs on "postcards" that were then turned into Gilb at the end of the day.  (Wolbersen Dep. Tr. at 19-21.)

the following couple of weeks, she sent e-mails to Hovance regarding her concerns and complaints about Gilb.  (Id.; Ex. 12.)

On December 12, 2003, Devin was contacted by Hovance and Vicki Schwartz, Schwan's Regional Sales Director (Schwartz Dep. Tr. at 13-14), regarding Devin's complaints.  (Clay Aff. Ex. 13.)  The two asked Devin "what kind of resolution [she] was seeking."  (Id.)  Devin responded that she "wanted to be out from under a poor working environment, and was willing to transfer to meet that goal."  (Id.)  Hovance and Schwartz had Devin forward her resume to them in the hopes of finding an acceptable transfer position for her at Schwan's.  (Id.)  During the conversation, Hovance and Schwartz informed Devin that Gilb would be attending an EEO seminar.  (Id.)  Devin responded that she was "very happy to hear that.  That [she] did not think [Gilb] was a bad person in total, but that . . . he could benefit from such training."  (Id.)  On December 13, 2003, Devin wrote Hovance and Schwartz an e-mail thanking them for the call and stating that the "concern and follow-through you . . . have shown are very much appreciated, and have renewed my confidence in Schwan's open-door policy."  (Clay Aff. Ex. 14.)

On December 20, 2003, Devin again wrote to Hovance and Schwartz, but this time to express her disappointment with their lack of responsiveness to her concerns.  (Clay Aff. Ex. 15.)  She had not heard back from them regarding a possible transfer, and she stated her "work environment continues to deteriorate and is just shy of intolerable."  (Id.)  She alerted them to the fact that she would "continue with a formal complaint to the EEOC."  (Id.)  On December 22, 2003, Schwartz responded that she was "sorry for the lack of follow

9

up," and that Schwan's was "working towards a resolution." (Id. Ex. 17.) Schwartz also stated that she wanted to meet with Devin and Gilb "face-to-face" on January 6, 2004. (Id.)

On January 6, 2004, Devin met with Schwartz and Gilb. (See Clay Aff. Ex. 18.) Rather than providing a forum in which to address Devin's various concerns regarding her working relationship with Gilb, Devin perceived the meeting as a critique of her performance. (Id.) At the conclusion of the meeting, Schwartz told Devin that "she was confident [Devin] could succeed because [Devin] was articulate, talented, and presented [her]self well. [Devin] could, [Schwartz] said, be the best salesperson in the depot." (Id.) Schwartz also told Devin that she and Gilb "had confidence in [Devin's] abilities." (Id.) Devin was disappointed that the meeting had become a "performance review," and in the days following the meeting, had not made up her mind regarding "what [she was] going to do." (Devin Dep. Tr. at 236.)

Devin started a pre-scheduled, week-long vacation on January 7, 2004. (Devin Dep. Tr. at 232-35.) Devin "spent the entire week . . . thinking about what options to pursue and whether there was any other recourse, and it was around the 13th that [she] decided that there really was no other recourse, and the situation had become hopeless."[4] (Id. at 246.)

_____

[4]Devin alleges that, during her time off, she received a phone call from Fistrovich, who wanted to give her a "heads-up" that Gilb was "rifling in [her] truck," and that Gilb was "going to use inventory issues" to "get rid" of her. (Devin Dep. Tr. at 236-37; Clay Aff. Ex. 4.) Fistrovich did not say he had spoken to Gilb, nor did he explain why he thought this was going to happen. (Devin Dep. Tr. at 237.) Devin never complained to Schwan's about Fistrovich's call and she testified that it "was not [her] reason for quitting." (Id. at 245-46.)

On January 14, 2004, Devin resigned her position at Schwan's.  (Clay Aff. Ex. 22.)

**E.      The Instant Action**

On October 21, 2004, Devin filed the instant action.  She alleges claims of gender

discrimination in violation of Title VII, 42 U.S.C. § 2000e-2 (Compl. ¶¶ 27-31), and the

Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08 (id. ¶¶ 32-37); pay

discrimination in violation of the federal Equal Pay Act, 29 U.S.C. § 206(d)(1) (id. ¶¶ 38-

43), and the Minnesota Equal Pay Act, Minn. Stat. § 181.67 (id. ¶¶ 44-48); and retaliation

in violation of Title VII, 42 U.S.C. § 2000e-3 (id. ¶¶ 49-53), and the MHRA, Minn. Stat. §

363A.15 (id. ¶¶ 54-57).  Schwan's now moves for summary judgment on all of Devin's

claims.

**Standard of Decision**

Summary judgment is proper if, drawing all reasonable inferences favorable to the

non-moving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

The moving party bears the burden of showing that the material facts in the case are

undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety

Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the

nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th

Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The

nonmoving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

### Analysis

Devin argues that she has raised genuine issues of material fact as to each of her

claims.  She contends that she was discriminated against because of her gender when she

was: (1) subjected to a hostile work environment, (2) denied a route builder, and (3)

constructively discharged.  (Mem. in Opp'n at 24-31.)  She also claims that she was

retaliated against for complaining to Schwan's that Gilb was treating her unfairly because of

her gender.[5]  (Id. at 33-39.)  Finally, Devin argues that she was denied equal pay because

Gilb allowed her pay to fall below $700 per week on three occasions.  (Id. at 31-33.)  The

Court will consider each claim below.

### A.        Gender Discrimination—Hostile Work Environment

Devin contends that she "endured a continuing pattern of gender harassment

throughout her employment."  (Mem. in Opp'n at 25.)  She points to comments allegedly

made by Gilb that she should "hostess" sampling parties, that she was "tougher" than he

---

[5]While Devin brings her gender discrimination and retaliation claims under both
Title VII and the MHRA, the Court looks to federal case law to analyze claims under both
statutes.  Riser v. Target Corp., — F.3d —, 2006 WL 2370475, at *3 (8th Cir. Aug. 17,
2006); Mems v. City of St. Paul, Dep't of Fire and Safety Servs., 224 F.3d 735, 738 (8th
Cir. 2000).

thought she would be, and that she was "emotionally charged" during a heated discussion

regarding route builders.  (Id.)  She also cites the fact that she was not assigned a route

builder until December, she was unfairly disciplined, she was not paid the same as male

RMs, she was denied the ability to expense cell phone charges, and treated differently than

male RMs with respect to truck inventory.  (Id.)

       To establish a claim of hostile work environment, a plaintiff "must show (1) [she]

belonged to a protected group; (2) [she] was subjected to unwelcome harassment; (3) the

harassment was based upon [the protected group status]; (4) the harassment affected a term,

condition, or privilege of [her] employment; and (5) the employer knew or should have

known of the harassment and failed to take proper remedial action."  Green v. Franklin Nat'l

Bank of Minneapolis, — F.3d —, 2006 WL 2419171, at * 5 (8th Cir. Aug. 23, 2006)

(internal quotation and alteration omitted).  Harassment which is severe and pervasive is

deemed to affect a term, condition, or privilege or employment.  Elmahdi v. Marriott Hotel

Servs., Inc., 339 F.3d 645, 652 (8th Cir. 2003).  The objectionable environment must be

both objectively severe, as it would be viewed by a reasonable person, and subjectively

severe, as it was actually viewed by the victim.  See Green, 2006 WL 2419171, at *5.

       Devin has not shown harassment sufficiently severe or pervasive to have affected a

term, condition, or privilege of her employment.  Even if the Court were to construe Gilb's

comments that she should hostess sampling parties, that she was tougher than he thought

she would be, or that she was emotionally charged, as discriminatory and offensive, those

comments were "neither severe nor pervasive enough to create a hostile work

environment." Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 844 (8th Cir.

2002) (internal quotation omitted).  Nor were they "sufficiently derogatory or demeaning

to permit a finding that they altered the terms of [Devin's] employment." Breeding v.

Arthur J. Gallagher and Co., 164 F.3d 1151, 1159 (8th Cir. 1999).

Likewise, that Devin felt she was unfairly criticized or disciplined does not amount

to actionable harassment on the basis of sex.  See id. (rejecting age-based hostile work

environment claim where the plaintiff "felt she was unfairly criticized and often yelled at,

but these conditions, while not desirable, do not amount to actionable harassment").  Gilb's

work-related actions with respect to Devin were neither gender-based nor harassment.  See

Gipson v. KAS Snacktime Co., 171 F.3d 574, 579 (8th Cir. 1999) (finding that supervisor's

"work-related reprimand was neither racial nor harassment").  "Because the discrimination

laws are not a general civility code, offhand comments and isolated incidents (unless

extremely serious) will not amount to discriminatory changes in the terms and conditions

of employment." Wallin v. Minnesota Dept. of Corrections, 153 F.3d 681, 688 (8th Cir.

1998) (internal quotations and alterations omitted).  "[T]his cause of action is limited to

extreme work conditions," Gipson, 171 F.3d at 579 (citing cases), and Devin has failed to

raise a genuine issue of material fact with respect to hers.  Accordingly, her hostile work

environment claim fails.

**B.      Gender Discrimination—Disparate Treatment**

Devin next claims that she was subjected to disparate treatment because of her

gender.  She alleges that she suffered two adverse employment actions because of this

discrimination: (1) she was denied a route builder until December 2003 (Mem. in Opp'n at 28-29), and (2) she was constructively discharged (id. at 30-31).

To establish a prima facie case of disparate treatment, Devin must establish: (1) that she is a member of a protected class; (2) that she was qualified for her position and performed her duties adequately; and (3) that she suffered an adverse employment action under circumstances that would permit the court to infer that unlawful discrimination was involved. Sallis v. University of Minnesota, 408 F.3d 470, 476 (8th Cir. 2005). Devin is a member of a protected class. Assuming, without deciding, that she has satisfied the second element of her prima facie case, the Court will proceed to consider her claims that she suffered an adverse employment action.

### 1.    Denial of a Route Builder

Devin was not assigned a route builder from April to December 2003. She claims this was an adverse employment action because "[o]bviously, a route with more stops and more customers can earn more income." (Mem. in Opp'n at 28.) Devin also alleges that the "denial of a route builder had the effect of disadvantaging [her] in her position and ability to make sales." (Id. at 28-29.)

In the context of a disparate treatment claim, "[a]n adverse employment action means a material employment disadvantage, such as a change in salary, benefits, or responsibilities." Sallis, 408 F.3d at 476 (internal quotation omitted). "Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action." Cruzan v. Special Sch. Dist. #1, 294 F.3d 981, 984 (8th Cir.

15

2002) (citation omitted).  Also insufficient are "[c]hanges in duties or working conditions that cause no materially significant disadvantage."  Bradley v. Widnall, 232 F.3d 626, 632-33 (8th Cir. 2000) (internal quotation omitted).

The Court determines that the denial of a route builder to Devin until December 2003 was not an adverse employment action sufficient to meet her prima facie case.  While it is true that the goal of a route builder is to build business for Schwan's, Devin has not set forth sufficient evidence that the lack of a route builder for a period of time on her route was a material employment disadvantage.  Sallis, 408 F.3d at 476.  For example, she points to the deposition testimony of Wolbersen, stating that it can be "somewhat" helpful to have a route builder assigned to a route.  (Mem. in Opp'n at 29 (citing Wolbersen Dep. Tr. at 49).)  He also testified, however, that route builders "have a tendency to sign up everybody and anybody," meaning that much of their work does not lead to more customers for RMs.  (Wolbersen Dep. Tr. at 49.)  Aside from this type of general testimony, Devin has not presented any evidence that route builders materially increased sales or income for RMs.  Accordingly, the Court concludes that she has not raised a genuine issue of material fact with respect to whether the denial of a route builder was an adverse employment action.

Even if it were to constitute an adverse employment action, however, it does not, in this instance, give rise to an inference of discriminatory intent.  Gilb testified that there were close to 20 RMs working out of the Savage Depot when he was the supervisor.  (Gilb Dep. Tr. at 15.)  The evidence also indicates that there were generally only three to five route builders working out of a depot at a time, and that number would fluctuate as route

builders filled in for RMs who were on vacation or were themselves promoted to RMs. (See, e.g., Wolbersen Dep. Tr. at 52; Gilb Dep. Tr. at 36.)  Gilb testified that he gave priority to the routes that he wanted to build "route days" onto because those routes were changing from "single" to "split" (Gilb Dep. Tr. at 48), and there is no evidence to suggest that this is not, in fact, how he assigned the route builders.[6]  That there were around 20 RMs employed out of the Savage Depot during Devin's employment and, at most, five route builders at any given time, lends support to Gilb's testimony that he assigned Devin a route builder "[a]s soon as [he] had somebody available to top off routes."[7]  (Gilb Dep. Tr. at 95.) Accordingly, the Court determines that Devin has failed to establish a prima facie case of disparate treatment based on the denial of a route builder.[8]

---

[6]Devin argues that Gilb's asserted method for assigning route builders is "false and pretextual" because "Fistrovich was given a route builder months before Devin and he did not work a split shift route."  (Mem. in Opp'n at 29.)  However, Devin neglects to alert the Court to the fact that she, herself, testified that "a couple of months after Mr. Fistrovich left [his route] did become a split shift."  (Devin Dep. Tr. at 109.)  Further, she testified that she did not know whether, at the time a route builder was assigned to Fistrovich's route, Schwan's was contemplating turning it into a split route.  (Id. at 109-10.)

[7]Devin points out that Hovance agreed with Devin's contention that she was the only RM who had been assigned to a route for "a substantial amount of time" without receiving route building assistance.  (Mem. in Opp'n at 9 (citing Hovance Dep. Tr. at 111).)  However, Gilb has never suggested that he assigned route builders to RMs based on the length of time they had their routes.  Accordingly, this "fact" does not give rise to an inference of discriminatory intent on the part of Gilb.

[8]Even if Devin could establish a prima facie case of discrimination based on the denial of a route builder, the Court determines that, for the reasons discussed above, she cannot raise an issue of fact as to whether Gilb's decision to not assign her a route builder until December 2003 was a pretext for discrimination.  See Riser v. Target Corp., — F.3d —, 2006 WL 2370475, at *3 (8th Cir. Aug. 17, 2006) (rejecting plaintiff's pretext argument, noting that "[w]hile [the plaintiff] may have some concerns about [the

## 2.      Constructive Discharge

Devin argues that she "endured a continuing pattern of discrimination and

harassment" which made it "both objectively and subjectively reasonable for [her] to

resign." (Mem. in Opp'n at 30-31.)  "Constructive discharge occurs when an employer

deliberately renders the employee's working conditions intolerable, thereby forcing her to

quit." Tatum v. Arkansas Dep't of Health, 411 F.3d 955, 960 (8th Cir. 2005) (internal

quotation omitted).  To prove a case of constructive discharge, a plaintiff must show that:

(1) a reasonable person in his situation would find the working conditions intolerable, and

(2) the employer intended to force the employee to quit.  Id.  "[I]ntolerability of working

conditions is judged by an objective standard, not the employee's subjective feelings."

Gartman v. Gencorp, Inc., 120 F.3d 127, 130 (8th Cir. 1997) (internal quotation omitted).

And, "part of an employee's obligation to be reasonable is an obligation not to assume the

worst and not to jump to conclusions too fast."  Id. (internal quotations omitted) (emphasis

in original).

The Court determines that Devin's constructive discharge claim must fail.  Similar

to her hostile work environment claim, she has failed to present evidence of objectively

intolerable working conditions sufficient to meet her burden on this claim.  See Tatum, 411

F.3d 960; cf. Henderson v. Simmons Foods, Inc., 217 F.3d 612, 614, 617 (8th Cir. 2000)

(finding the plaintiff had been constructively discharged where she resigned "[o]nly after

---

employer's] management style, he does not have a Title VII claim").

enduring months of abusive sexual harassment" including lewd gestures and "what can only

be described as the crudest of sexual vulgarities").  Nor has she presented any evidence to

suggest that there was any intent on the part of Gilb or Schwan's to force her to quit.  In

fact, her own notes from her last meeting with Gilb and Schwartz—which took place before

Devin decided to resign—indicate that Schwartz said she was "confident [Devin] could

succeed because [Devin] was articulate, talented, and presented [her]self well"; that Devin

could "be the best salesperson in the depot"; and that "both [Schwartz] and [Gilb] had

confidence in her abilities."  (Clay Aff. Ex. 18.)  This is not conduct indicative of an intent

to force Devin to resign.  Accordingly, Devin has failed to raise a genuine issue of material

fact with respect to her claim of constructive discharge, and that claim will be dismissed.

**C.       Retaliation**

Devin claims that she suffered "numerous adverse actions" in retaliation for

complaining to Hovance about Gilb's treatment of her.  (Mem. in Opp'n at 36.)  To make a

prima facie case of retaliation, Devin must show (1) she engaged in a protected activity; (2)

she suffered an adverse employment action; and (3) a causal connection exists between (1)

and (2).  Robinson v. Potter, 453 F.3d 990, 994 (8th Cir. 2006) (citation omitted).  Devin

points to two complaints she made to Hovance as instances of protected activity; one in late

June 2003, and the other on November 26, 2003.  The Court will assume that these

complaints constitute protected activity, and will move on to consider the two remaining

prongs of her prima facie case.

**1.       Adverse Employment Action**

Devin claims she suffered adverse employment actions when she was "written-up regarding the postcards" and was not assigned a route builder after approaching Gilb about her desire to have one assigned to her route.[9] (Mem. in Opp'n at 38-39.) She also argues that the January 6, 2004 meeting she had with Schwartz and Gilb, which turned into "a performance review" rather than a meeting to address Devin's concerns, was an adverse employment action.

The United States Supreme Court recently reviewed the contours of the adverse employment action requirement in the context of Title VII retaliation claims, and announced a different standard than that previously used by the Eighth Circuit. Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2410 (2006) (citing Manning v. Metropolitan Life Ins. Co, 127 F.3d 686, 692 (8th Cir. 1997) as setting a "more restrictive approach" to defining the scope of the adverse employment action requirement in retaliation cases); but see, e.g., Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir.

---

[9]Devin also claims that she was not given pay guarantees that males were given and "Gilb interfered with [her] inventory." (Mem. in Opp'n at 36.) Devin was in fact receiving a daily guarantee throughout her time at Schwan's. (See infra pp. 26-28.) She also received supplemental pay at times when her sales did not reach $700 per week. (Id.) To the extent that she did not receive supplemental pay, Devin does not argue that this was causally connected to any protected activity. (See Mem. in Opp'n at 36-39.) With respect to her inventory, it is unclear what Devin is referring to. There is no evidence that Gilb did, in fact, interfere with her inventory, despite the fact that she alleges she received a call to that effect from Fistrovich. (See supra p.11, n.4.) She also claims that she was treated differently in some respects with respect to inventory. (See Mem. in Opp'n at 13-14.) To the extent this is what Devin is referring to, the Court determines that she has not raised a genuine issue of fact with respect to whether the inventory issues constitute a material adverse action.

1997) (noting that "retaliatory conduct may consist of action less severe than outright

discharge" (internal quotation omitted)).  The Court ruled that "the anti-retaliation

provision [of Title VII], unlike the substantive provision, is not limited to discriminatory

actions that affect the terms and conditions of employment."  White, 126 S. Ct. at 2412-13

(citation omitted).   It also held that "a plaintiff must show that a reasonable employee

would have found the challenged action materially adverse, which in this context means it

well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."  Id. at 2415 (internal quotations omitted).  The Court explained: "[w]e

speak of material adversity because we believe it is important to separate significant from

trivial harms."  Id. (emphasis in original).

       In light of this recent expansion of the adverse employment action prong of the Title

VII retaliation claim, Devin argues that she has raised genuine issues of material fact with

respect to whether she suffered adverse employment actions for purposes of her retaliation

claim.[10]  The Court determines, however, that she has failed to do so.  The fact that she

received a single "write-up" regarding her "postcards"—her daily requirement for new

contacts—does not constitute a material adverse action.  It clearly falls within the category

of "trivial" harms, White, 126 S. Ct. at 2415, as there is no indication that Devin suffered

---

[10]Devin does not argue that the standards for establishing a claim of retaliation under
the MHRA and Title VII are different in any respect.  Specifically, she does not claim that
the standards under the MHRA are more favorable to her case than those recently
announced in White.  (See Mem. in Opp'n at 36.)  Accordingly, the Court's analysis of her
Title VII retaliation claim under White also applies to her MHRA claim.  (See also supra p.
13, n.5.)

any disadvantage whatsoever from having received this "write up."  This is bolstered by

Gilb's testimony that the "write-up" Devin received was not a "Schwan's form" nor was it

"part of the discipline process."  (Gilb Dep. Tr. at 79-80.)  Rather, "[i]t was something

[Gilb] would give as a reminder to route managers that they aren't hitting their targets."  (Id.

at 79.)  Accordingly, the Court determines that Devin's "write-up" was not an adverse

action.

Similarly, Devin's January 6, 2004 meeting with Gilb and Schwartz cannot be

construed as an adverse action.  Devin perceived the meeting as a performance review, and

therefore argues that it was an adverse action.  (See 9/5/2006 Clay Letter to the Court

("The most significant adverse action occurred when human resources led Ms. Devin to

believe that a company representative was coming to address her discrimination

complaints, but instead Ms. Schwartz gave Ms. Devin a performance review.").)  However,

Devin's notes from the meeting show that she did address with Schwartz and Gilb her

concerns regarding not being assigned a route builder, one of her main complaints during

her time at Schwan's.  (Clay Aff. Ex. 18.)  While Devin clearly would have preferred to

solely address her concerns regarding what she perceived as unfair treatment by Gilb, there

is no indication that she attempted to address those issues but was prevented from doing so

by Schwartz and Gilb.  And, as noted above, Devin received positive encouragement

regarding her potential as an RM from Schwartz and Gilb at the end of the meeting.  (Clay

Aff. Ex. 18.)  Therefore, Devin has not raised a genuine issue of material fact with respect

to whether the January 6, 2004 meeting constituted a material adverse action.

Finally, Devin claims that the denial of a route builder was a material adverse action. As the Court discussed above, this action does not rise to the level of "a material employment disadvantage, such as a change in salary, benefits, or responsibilities." Sallis, 408 F.3d at 476 (internal quotation omitted), for purposes of a substantive claim of discrimination. (See supra pp. 15-17.) White has changed that standard with respect to claims of retaliation. 126 S. Ct. at 2412-13.

Even under the standard announced in White, however, the Court determines that Devin has failed to raise a genuine issue of material fact with respect to whether the denial of a route builder was a "materially adverse" action, such that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415. Devin has not presented any evidence to show that route builders actually increased the sales or income for RMs who did receive them. Furthermore, Devin was assigned a route builder after bringing it to Gilb's attention numerous times in December 2003. Accordingly, the Court concludes that the denial of a route builder until December 2003 was not a materially adverse action for purposes of Devin's retaliation claims. Nonetheless, for the sake of completeness, the Court will consider the issue of causation with respect to the route builder issue.

### 2.      Causation

Devin argues that she has established the required causal link between her complaints and Gilb's decision not to assign her a route builder because, in August 2003, more than a month after she first complained to Hovance regarding Gilb, she "approached

23

Gilb about receiving a route builder but Gilb said he did not know when he would assign a route builder to Devin's route."  (Mem. in Opp'n at 38-39.)  Then, in October, Gilb assigned "a route builder to Fistrovich, a newer employee."  (Id.)

These facts do not raise an inference of causation sufficient to survive summary judgment on her retaliation claims.  That Devin asked Gilb about being assigned a route builder more than a month after she complained to human resources regarding Gilb does not create a causal inference sufficient for her retaliation claim.  Her notes regarding her August inquiry do not indicate anything unpleasant or acrimonious about the exchange. (Clay Aff. Ex. 4.)  Devin noted that Gilb "said [she] was on the list, but that he couldn't give [her] a date, as he had made a commitment to building 'split shift dual' routes."  (Id.)  This is consistent with Gilb's testimony regarding how he prioritized the assignment of route builders, and raises no inference of causation sufficient for either the prima facie or pretext burden Devin must satisfy on her retaliation claim.  And, the more than one-month period of time between her inquiry and her complaint to Hovance cannot, alone, create an issue of fact as to causation.  See Green, 2006 WL 2419171, at *9 (noting that the court "need not decide the question of when or whether timing alone can establish a prima facie retaliation claim because we have said timing alone is insufficient to show a pretextual motive rebutting a legitimate, non-discriminatory reason for an adverse employment action" (citation omitted)).  Accordingly, Devin's retaliation claims will be dismissed.

**D.      Denial of Equal Pay**

Devin asserts claims of unequal pay under Title VII, the MHRA, the federal Equal

Pay Act, and the Minnesota Equal Pay Act.  (Mem. in Opp'n at 31.)  She claims "that

Schwan's gave extended and supplemental guarantees to male employees in order to ensure

their pay was more than $700 per week," that she was not given those guarantees,  and that

her pay fell below the "$700 mark" "[o]n a number of occasions."  (<u>Id.</u> at 33.)  She argues

that "Wolbersen, Christenson, Fistrovich, and Renaud were all given extended guarantees

that were not given to [her]."  (<u>Id.</u>)

 In order to succeed on a gender-based wage discrimination claim under state or

federal law, Devin must "prove that her employer pays different wages to employees of

opposite sexes for equal work on jobs the performance of which requires equal skill,

effort, and responsibility, and which are performed under similar working conditions."

<u>Sowell v. Alumina Ceramics, Inc.</u>, 251 F.3d 678, 683 (8th Cir. 2001) (discussing Title VII)

(internal quotation and citation omitted); <u>see also</u> <u>EEOC v. Delight Wholesale Co.</u>, 973

F.2d 664, 669 (8th Cir. 1992) (holding that same standard applies to Equal Pay Act and

Title VII wage-discrimination claims); <u>Kolstad v. Fairway Foods, Inc.</u>, 457 N.W.2d 728,

734 (Minn. Ct. App. 1990) (Minnesota Equal Pay Act claim).

 The Court's review of the record reveals that Devin was paid less than $700 per

week—that is, her income from commissions was less than $700, and her pay was not

"supplemented"—on three occasions during her year of employment at Schwan's.  (Clay

Aff. Ex. 41.)  The record also shows that her pay was "supplemented" on four occasions

when her commissions otherwise would have been below $700 per week—one week during

each of the months of September, October, November, and December 2003.  (Clay Aff. Ex.

4; Gilb Dep. Ex. 8.)  Devin was on a declining, or step-down, guarantee when she ended her

employment at Schwan's; in late November and early December she was receiving a $35

per day guarantee, which then declined to $30 per day during the second week of December

2003.  (Gilb Dep. Exs. 5, 8.)  This is the extent of the evidence Devin has provided to the

Court regarding her compensation at Schwan's; as will be explained below, it is insufficient

to meet her burden.

Devin has submitted weekly "commission reports" for RMs Wolbersen,

Christenson, and Renaud.  (Clay Aff. Exs. 28, 30, 33.)  She did not provide those reports for

Fistrovich—the other employee who she claims was paid more than she was—but the Court

located his reports elsewhere in the record.  (Fistrovich Dep. Ex. 81.)  The commission

reports set forth the employees' pay for a given week, and break down the amount of

weekly pay coming from commissions and the amount of weekly pay coming from

"guarantees."  (See, e.g., id.)  Remarkably, Devin has not provided the Court with a

complete set of her own commission reports or any other documents outlining her weekly

pay[11]; this makes it impossible for the Court to meaningfully compare her pay to that

---

[11]Also significant is the fact that Devin has not argued with any specificity that her
actual weekly pay was regularly less than that of any specific male RM, nor has she directed
the Court's attention to documents demonstrating as much.  To the extent that the record
contains other pay-related documents that the parties have not cited to with adequate
specificity, the Court notes that it is not "obligated to wade through and search the entire
record for some specific facts which might support the nonmoving party's claim."  Jaurequi
v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation and citation
omitted); Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006) ("Without
some guidance, we will not mine a summary judgment record searching for nuggets of
factual disputes to gild a party's arguments.").

received by the male RMs she points to.  To the Court's knowledge, the record before it contains only four of Devin's weekly commission reports (see Gilb Dep. Exs. 5, 8), and those four reports were not submitted to the Court by Devin.[12]

The records the Court does have with respect to Devin reflect the following:

- Wolbersen: Wolbersen was not receiving a step-down guarantee in November and December 2003, when Devin was; Devin was paid more than Wolbersen for the week of November 17, 2003 (Devin's pay that week came to $856.64; Wolbersen's was $808.56).  Wolbersen was paid more than Devin for the other three weeks for which the Court has Devin's commission reports.  The Court's review of Wolbersen's commission reports (Denzer Decl. G31) reveals that he was paid less than $700 per week on thirteen occasions from January 2003 through December 2003 and that he did not receive any "supplemental" pay on those occasions.[13]

- Christenson: Christenson was receiving a step-down guarantee in November and December 2003, when Devin was.  Devin was paid more than Christenson for the week of November 17, 2003 (Christenson's pay that week came to $798.91, compared to Devin's $856.64.)  (Clay Aff. Ex. 30.)  Christenson was paid more than Devin for the other three weeks for which the Court has Devin's commission reports.  Christenson was paid less than $700 per week on at least one occasion without receiving "supplemental" pay.  (Id.)

- Renaud: Renaud's commission reports indicate that he was not being paid by commission at all.  (Clay Aff. Ex. 33.)

- Fistrovich: Fistrovich's commission reports indicate the same thing—that he was not receiving any commission pay.  (Fistrovich Dep. Ex. 81.)

---

[12]Devin did submit three pay stubs to the Court documenting the three weeks in which her pay was under $700 and was not supplemented; two of those weeks are represented in the commission reports contained in the record.  (Clay Aff. Ex. 41.)

[13]This is contrary to the statement made in Devin's Memorandum in Opposition to the instant Motion that, while he was receiving a supplemental step-down guarantee, "Wolbersen only had one single paycheck that was less than $700."  (Mem. in Opp'n at 4.) Even if the Court confined its search to that period of time, it counts five weeks for which Wolbersen's pay was less than $700.  (Clay Aff. Ex. 28.)

The evidence submitted by Devin is simply insufficient for the Court to determine that she was being discriminated against in her pay. Furthermore, the evidence that is before the Court—whether submitted by Devin or even referenced by the parties—belies her claims. The Court has not been directed to any specific instance in which a male employee's weekly pay was "supplemented" because it fell below $700. And, in fact, Wolbersen's and Christenson's pay—the only two commission-based employees who Devin points to—did fall below the $700 mark. Accordingly, the Court determines that Devin has failed, by a wide margin, to satisfy her burden on her equal pay claims, and those claims will be dismissed.

**E.      Conclusion**

Devin's hostile work environment claim must fail because she did not present evidence that she was subjected to intolerable working conditions at Schwan's. Her claims of gender discrimination will also fail because Devin did not suffer an adverse employment action. Similarly, her claims of retaliation will fail because she did not suffer a material adverse action and, even if she had, she did not raise an issue of fact as to causation. Finally, Devin's equal pay claims fail for want of evidence.

**Conclusion**

Based on the foregoing and all the files, records and proceedings herein, it is **ORDERED** that Schwan's Home Service Inc.'s Motion for Summary Judgment (Doc. No. 89) is **GRANTED**, and Devin's Amended Complaint (Doc. No. 29) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: September 8, 2006                         s/Richard H. Kyle
                                                RICHARD H. KYLE
                                                United States District Judge